WELLMAN *v.* WELLMAN.

DIVORCE—CRUELTY—HUSBAND AND WIFE.

On appeal from a decree of divorce finding that the complainant wife was guilty of extreme cruelty, conflicting evidence is considered and *held*, to sustain the conclusion of the circuit judge.

Appeal from Wayne; Hosmer, J. Submitted November 5, 1913. (Docket No. 76.) Decided December 20, 1913.

Bill by Ida E. Wellman against Samuel Wellman for divorce. Defendant filed a cross-bill. From a decree for defendant, complainant appeals. Affirmed.

*John Miner,* for appellant.

*George F. & Peter J. Monaghan,* for appellee.

OSTRANDER, J. The parties to this suit were married April 12, 1910, after an acquaintance of five weeks, during which time complainant had acted as housekeeper for the defendant, who was a widower. She left him on the 20th of June, 1910, going into the country a short distance from Detroit, where she worked for 10 days, and until her husband came after her. They then lived together until October, 1910, when she again left him and went to Flint, Mich., where she opened a boarding and rooming house. December 28, 1910, her husband filed in the circuit court for the county of Wayne, in chancery, his bill for divorce from her. He made an affidavit of her nonresidence. December 12, 1911, complainant filed her answer in that cause, in which, protesting her innocence of the charges and delinquencies set up in the bill of complaint, she averred that on the 8th of Octo-

ber, 1911, she met her husband in the city of Detroit, at which time they mutually forgave and condoned the faults, delinquencies, and shortcomings of each other, and agreed to live thereafter and cohabit as husband and wife, agreeably with which arrangement she says they did again live and cohabit together as husband and wife. January 22, 1912, a decree was entered in that cause, dismissing the bill without costs, the decree reciting that the parties have mutually condoned and forgiven their faults, delinquencies, and shortcomings occurring during their married life, and were at the date of the decree living and cohabiting together as husband and wife.

Complainant again left defendant in April, 1912, and she sets up in her bill of complaint that defendant has from the time of her marriage, continued an unremitting and ceaseless course of cruelty towards her, some of the details of which are specified; that his conduct was the cause of her leaving him upon the occasions referred to, and she sets up in addition the conduct of the defendant in filing his bill of complaint against her, which she says set up a series of false, wicked, and groundless charges, and she asks for a decree of divorce from the bonds of matrimony and for alimony. An order was made requiring the defendant to pay her $8 a week, beginning April 20, 1912, to pay the rent of the telephone in the house she occupied, the account of the Detroit Gas Company for gas consumed on the premises, and $40 solicitor's fee. In June, 1912, the defendant filed his answer in the nature of a cross-bill, which prays that if the court finds the parties are not legally married, their purported marriage may be annulled, and if the court finds that they are married, that a divorce from the bonds of matrimony be granted to the defendant. There was an answer to the cross-bill, replication, the cause came on for hearing December 5, 1912, in open court, and on January 18, 1913, a de-

cree was entered in which it was found that the complainant had been guilty of the several acts of extreme cruelty charged in the answer and cross-bill, dissolving the marriage, and making no allowance to complainant in the way of alimony, but giving her the custody of her minor child. Upon her application to this court, an order was made allowing her $125 for expenses of her appeal, the matter of solicitor's fees to abide the final result.

An examination of the record has not convinced us that the decree of the court below ought to be disturbed. No children were born of the marriage. Complainant's story of her life is briefly told. She is 36 years old, born in Germany. She came to the United States in October, 1901, from Berlin, where she had been employed in business. She came alone and went to Pittsburgh, Pa. She had not been married, but she left an infant daughter in Germany in care of her sister. She was employed for a short time as a nurse and then as housekeeper for a man by the name of Loeblich, whose family consisted of himself and four children. Eight or nine weeks after assuming this position as housekeeper, she married Mr. Loeblich and lived with him for a year and a half, giving birth to a child, which lived a few weeks. Claiming that his treatment of her was cruel, she left him, taking with her some money which belonged to him, and went to Atlantic City. There she was employed for a few weeks as a waitress, when she went to Philadelphia and accepted a position as demonstrator for the Shredded Wheat Biscuit Company. In course of time she determined to go back to Germany, procured passage, but at Hoboken changed her mind and decided not to go. She went to Jersey City and worked in a bakery, and finally opened a boarding house, before doing which, however, she made a second visit to Pittsburgh, called at Loeblich's house, and the woman she saw there said to her, "You have no

more claim on Mr. Loeblich." At her boarding house was a man by the name of Bernard Koekock. She married him May 22, 1905, and sent to Germany for her child, who came and lived with her. Learning in June or July, 1906, that Loeblich had not been divorced from her, she sold the property she had accumulated and went to Springfield, Mass., with the child. There she opened a restaurant. Koekock followed her to Springfield, whereupon she sold her restaurant, went to New York with her child, and took passage for Germany. She came back in four weeks, leaving her child with her sister. She landed at Baltimore, worked as chambermaid in a hotel, worked in Washington, D. C., again went to Pittsburgh, and learned that Loeblich had, on April 24, 1907, secured a divorce. She then went to see Koekock and for a time (she is not very definite about it, but from a month to two months) she at night occupied the same room and same bed with Koekock. She left him, and has not seen him since. After that she again traveled as a demonstrator, held a position as housekeeper in Pittsburgh, went to Denver in 1908, and operated a restaurant there, then became housekeeper in a family in Denver, went to Los Angeles, Cal., and was there a housekeeper, lived in this latter place for eight months, and determined to go back to Germany. Arriving at New York and finding she had not enough money for the trip, she went to Detroit. She arrived some time in February, 1910, knowing no one there. She put an advertisement in the newspaper. Defendant answered it, and she was installed as housekeeper in his home March 8, 1910. I have omitted her statements of her reasons and motives for what she did, but this indicates sufficiently the variety and principal events of her life in America before she married defendant. It should be said that she appears by her statement to have been industrious and capable and to have maintained herself.

At the date of the hearing, the defendant was 57 years old. He was born in Port Huron, and had lived in Detroit for 19 years. He is a building contractor, and, according to his own statement, as superintendent of building he erected five stories on the Pontchartrain Hotel, built the gas office building, the addition to Grace Hospital, the addition to Harper Hospital, besides some residences, in the course of seven years. At the time of the hearing he was building Buhl Memorial Building at Harper Hospital. He testified that he had worked practically every day during the seven years, had never had a vacation. He was first married 37 years before the hearing took place, had children, of whom one son is living, now upwards of 30 years of age. His first wife died February 22, 1910. He met complainant by answering her advertisement in the newspaper. He went to see her, and she came to the house to see him and look over the situation. Before their marriage she told him of one man to whom she had been married, and said that she was divorced from him, but did not tell him his name nor the city where she had been married and divorced. It was not until August, he says, that he learned from her brother-in-law that she had been married the second time. He complains that almost from the beginning of their married life the complainant importuned him for money to go to Germany to get her child, or for money to have her child come to Detroit, to make some arrangement about his property which would provide for her; that upon occasions she abused him by speech both vulgar and profane; that, having furnished money to bring her child to Detroit, she constantly importuned him to adopt the child, which he finally did; wanted him to establish a bank account against which she could check, and to make a will of his property in her favor. He insists, also, that she never herself advised him

concerning her second marriage, nor satisfied him that she was legally in a position to contract her marriage with him.

I do not believe all that either of these parties testify to, but, as is usual in such cases, there are some facts fairly established by the testimony which control belief and the decision of the principal controversy. While the complainant does not appear to have loitered in any of the avenues which led to marriage, neither is defendant to be excused for contracting a marriage with the complainant, with the knowledge which he had of her, six weeks after his first wife died. Having married in haste, he should, and a man of finer instincts would, have refrained from questioning, in the manner he did, his wife's right to contract the marriage. He would have discovered the facts himself or have remained silent. It must be considered, however, that the information he had was rather disquieting. Defendant provided well for the complainant. He sent for and finally adopted her illegitimate child. He dismissed his son from his home upon her solicitation. He insured his life in her favor for $2,000. He purchased some property for a home in their joint names, established a bank account in their joint names, against which she had the right to draw checks, he bought her a diamond ring, he sought her out when she first left his home, and induced her to return, he took her back upon her second desertion, dismissing his own bill for a divorce. The work which he did indicates that he was industrious, and if occasionally, as she claims, he drank intoxicating liquors to excess, he seems not to have done so to an extent which interfered with the conduct of his business affairs. He seems to have been a somewhat credulous, easygoing man, attached to the complainant. I do not believe he ever shot at complainant or threatened to do so.

Complainant is clearly a purposeful woman, and

is evidently possessed of sincere maternal affection for her daughter. She has the purpose to take care of herself in a worldly way—a purpose commendable in an unmarried woman who has only herself to rely upon, but one which may become sinister and disturbing in the domestic relation. The testimony convinces me that in this direction she has overexerted herself, and has, and has had, no affection for defendant. She has not been sincere and open in her relations with him. One side light upon her character is disclosed by testimony of her husband, which she does not dispute, which is to the effect that on the day she left home for the second time she kissed him good-bye in the morning, expressing solicitude for his safety during the day. They had visited her sister the evening before and had had a pleasant time. At noon she called him on the telephone, asking him at what time he would be at home, and telling him to be careful not to get hurt. When he reached home he found a little note on the table in which she announced, "I am going to sue you for a bill of divorce; I am going to start a restaurant." She had stripped the house and drawn from the bank the entire deposit which had been put there by defendant in their joint names. She says she drew out the money upon the advice of counsel. He had given her $30 the previous evening. Then she sought to have defendant establish the old relations with her. He did not seek her, but, as has been stated, he had filed a bill to dissolve the marriage. She had established herself in business at Flint. She need not have returned to a condition of things which she now claims was intolerable.

Balancing the testimony, I am disposed to the conclusion that for the large troubles which these people had, complainant, and not the defendant, is responsible. I am satisfied she did not, before they were

married, tell him about her second marriage, certainly not about the fact that she had, knowing as she now claims she did, she was not his wife, lived with Koekock from one to two months. It is true that after complainant left defendant the second time, and after he had filed a bill for divorce against her after he knew of the fact of her second marriage, they again cohabited as husband and wife, and if he had filed this bill for a divorce and she, desiring to continue the marriage relation, had pleaded condonation, some effect would have to be given to the plea. But this is the third time complainant has left defendant's home. She charges cruelty from the inception of their married life. Her bill appears to be framed upon the theory, which accords with the general rule, that she is not bound by the condonation because similar offenses to those condoned have been repeated by her spouse. He, in turn, sets up the conduct of the complainant from the beginning of their married life. She has not established the charges she makes. He has fairly established that she continually sought a property arrangement; caused him to be arrested without reason; sought, without good reason, to embroil him with his employer, in whose concern he was also a shareholder; while living with him was plotting to leave him, and, in leaving, to secure his property, deceived him with respect to certain episodes in her life; made their domestic affairs notorious.

A decree will be entered, affirming the decree of the court below, but requiring defendant to pay complainant a solicitor's fee of $40.

STEERE, C. J., and MOORE, McALVAY, BROOKE, KUHN, STONE, and BIRD, JJ., concurred.